IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| JOSEPH GALVAN | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 7:16-CV-147-RAJ |
| | § | |
| | § | |
| FTS INTERNATIONAL SERVICES, LLC, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S FTS INTERNATIONAL SERVICES LLC'S RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant FTS International Services, LLC ("FTSI") files its Response to Plaintiff's Motion for Partial Summary Judgment as to Exemption Defenses ("Motion") (doc. 15) as follows:

**I.
INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Joseph Galvan ("Galvan") has sued FTSI, his former employer, claiming he was misclassified as exempt and is owed overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). Among other defenses, FTSI has pleaded that the FLSA's administrative and "highly compensated employee" exemptions applied to Galvan. Galvan seeks summary judgment on those affirmative defenses.[1]

In his Motion, Galvan blatantly disregards the Court's March 21, 2017 Order (doc. 14) ("Order") denying FTSI's earlier motion for partial summary judgment and finding that the determination of whether the "highly compensated employee" exemption applied to Galvan is a "fact-intensive analysis" incapable of determination as a matter of law "in the face of disputed

---

[1] FTSI also pleaded that the "executive" exemption applied to Galvan, and Galvan seeks summary judgment striking this affirmative defense as well. FTSI does not contest this aspect of the Motion.

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**                        **PAGE 1**

evidence." Although FTSI remains steadfast in its belief that the Court should have granted FTSI's motion and determined that the "highly compensated employee" exemption *does* apply as a matter of law, the Court has already held that a genuine issue of material fact exists regarding whether the "highly compensated employee exemption" applied to Galvan. Furthermore, it is disingenuous for Galvan to argue in his Motion that there is no issue of fact regarding whether the "highly compensated employee exemption" applied to him, when he recently argued that a genuine issue of fact does exist in his Response to FTSI's Motion for Summary Judgment (doc. 11). The Court is being asked to consider the "administrative" exemption for the first time. Largely for the same reasons, there is *at minimum* a genuine issue of material fact regarding whether that exemption applied to Galvan. The Court should deny the Motion with respect to both exemption defenses

## II.
## SUMMARY OF UNDISPUTED FACTS

A.  **FTSI and its Crews.**

FTSI is an oil and gas well completion services provider. App. 59 (Declaration of Karen Thornton ("Thornton Decl.") at ¶ 2). Exploration and production companies rely on FTSI's deep expertise and customized hydraulic fracturing solutions to enhance their recovery rates from oil and gas wells, primarily in unconventional plays. *Id.* FTSI's well completion services are available in Oklahoma, Pennsylvania, Texas, and surrounding areas, and FTSI crews generally work in specific geographic regions or "districts." *Id.* FTSI organizes its well completions staff into independent "crews," identified by a color and number, *e.g.,* "Red 1." *Id.* at ¶ 3. Each crew is led by a trained Service Supervisor, who typically manages 12-15 hourly workers. *Id.* Crews operating out of FTSI's Odessa, Texas, district typically worked 14 days on and 7 days off. *Id.* Crews were scheduled to work 12-hour shifts. *Id.*

B.  **Galvan's Employment with FTSI.**

FTSI hired Galvan as an Equipment Operator I on March 26, 2012. App. 6, 41-47 (Deposition of Joseph Galvan ("Galvan Dep.") at 21:4-18; Dep. Exhs. 1-2). FTSI promoted Galvan six times between March 2012 and April 2016, including Equipment Operator II and III, Fluid Technician I, Service Supervisor in Training (SSIT), and Service Supervisor I and II. App. 48-53 (Galvan Dep. Exhs. 5-9, 11). In March 2014, FTSI offered Galvan the job of Service Supervisor to run one of FTSI's Silver crews operating out of its Odessa, Texas, district. App. 12, 52 (Galvan Dep. 43:1-17; Dep. Exh. 9). Galvan accepted the Service Supervisor position with a compensation package that included a starting annual base salary of $75,000, plus a bonus on each completed stage. App. 12 (Galvan Dep. 44:1-21). Galvan knew when he accepted the promotion to Service Supervisor I that he would become eligible for bonuses unavailable to hourly Equipment Operators. App. 12 (Galvan Dep. 44:1-45:21). He claims not to have known how *much* those bonuses typically were when he started as a Service Supervisor, but he understood that he would be paid bonus dollars based on the number of stages completed, so long as the job went according to plan. App. 12-13 (Galvan Dep.45:22-46:2; 46:8-17). The jobs that Galvan supervised *did* go according to plan, and so he made "a lot of money in bonuses" as a Service Supervisor. App. 13 (Galvan Dep. 47:15-23). During the period he worked as a Service Supervisor, Galvan's annual compensation totaled well over $100,000 annually. App. 17, 54-55 (Galvan Dep. 64:20-23, 65:4-17; Dep. Exhs. 12, 13). Indeed, his total pay exceeded $130,000 in both 2014 and 2015. App. 17 (Galvan Dep. 64:24-65:17).

C.  **Galvan's Job Duties as a Service Supervisor.**

As a Service Supervisor, Galvan's primary duties included: (1) providing on-site supervision for all well completion jobs; (2) acting as FTSI's representative in dealings with

customers on site; (3) overseeing all crew activities from home base to servicing at the job locations to return to home base; and (4) treating the well from the data van. App. 12-13, 20, 56-58 (Galvan Dep. 42:18-25; 46:18-22, 74:14-23; Dep. Exh. 17); App. 59 (Thornton Decl. at ¶ 4). The crews Galvan managed were usually comprised of the following hourly crew members: 1-2 Mechanics, an E-Tech, and 10-15 Equipment Operators. App. 19 (Galvan Dep. 72:18-73:4).

The Equipment Operators supervised by Galvan performed manual-labor duties. App. 60 (Thornton Decl. at ¶ 9). Equipment Operators set up equipment ("rigging up"), ran equipment to treat the well, and took down equipment ("rigging down"). *Id.* Equipment Operators also cleaned and maintained equipment. *Id.* Galvan was not expected to routinely perform manual labor. App. 60 (Thornton Decl. at ¶ 7); App. 56-58 (Galvan Dep. Exh. 17). Galvan was expected to perform manual labor only to lead by example and demonstrate techniques or to assist on an emergency basis. *Id.* Instead, Galvan directed the work of Equipment Operators, was responsible for millions of dollars of equipment, answered questions from Equipment Operators, enforced company policies, and had the authority to stop work. App. 22-23 (Galvan Dep. 83:2-22, 85:22-86:5, 88:9-11).

Galvan spent significant time in the data van treating the well and communicating with the on-site customer representative. App. 16, 20, 30-31 (Galvan Dep. 60:12-23, 74:14-23, 117-19-118:1). The data van is "like an office" on wheels. *Id.* at 60:12-23. Treating the well involves controlling the fluids going down well by using computers in the data van and instructing hourly employees on what tasks needed to be completed. App. 16 (Galvan Dep. 60:12-23). The data van is a mobile office that has air conditioning, chairs, a window, radios and specialized computers. App. 59 (Thornton Decl. at ¶ 5). Galvan regularly communicated with his crew via radio from inside the data van; he had a view of both the wellsite and his crew

through the data van's window. App. 17 (Galvan Dep. 62:1-23). Galvan addressed any questions or job-related requests from the data van via radio. *Id.*

### D. The Distinction between Galvan's Job Duties and Those He Supervised.

Galvan received specialized training to treat the well from the data van; his subordinates were not trained to treat the well. *Id.* at 59:4-14. As such, he was the only one on the crew qualified to perform certain essential job functions while on-site. *Id.* Galvan was the highest-ranking operations employee on location and he decided what tasks he would perform during his shifts. App. 22 (Galvan Dep. 82:8-11; 85:19-24). Unlike the hourly employees he supervised, Galvan received FTSI-issued equipment including a cell phone, a computer, and a pickup truck. App. 13 (Galvan Dep. 47:25-48:21). According to Galvan, he was "the one running the show." *Id.* at 42:18-25. Notably, Galvan's own immediate supervisor was away from the job site at least 50% of the time. App. 14 (Galvan Dep. 52:1-21). Even when a Field Coordinator was on the job site, Galvan was usually the highest-ranking operations employee there and maintained his authority to direct the work of his crew. App. 22 (Galvan Dep. 82:8-11, 85:19-24). When his supervisor was not on location, Galvan was expected to keep him informed about the status of the job. When his supervisor was on location, Galvan continued to direct the work of his crew. App. 24-26 (Galvan Dep. 92:14-19, 94:22-99:1).

## III.
## ARGUMENT AND AUTHORITY

### A. Summary Judgment Standard.

Galvan seeks summary judgment on two affirmative defenses on which FTSI will have the ultimate burden of proof at trial. In the Motion, Galvan characterizes FTSI's burden at trial as a "substantial" one, requiring it to prove that the exemptions at issue "plainly and unmistakably" applied to Galvan. Regardless of FTSI's ultimate burden at trial, summary

judgment on FTSI's affirmative defenses is only permissible if Galvan "demonstrates an absence of evidentiary support in the record." *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). FTSI need only "present specific facts indicating a genuine issue for trial" on its affirmative defenses. *Id.* The Court may not make credibility assessments or weigh the evidence. *Reeves v. Sanderson Plumbing Prods. Co.*, 530 U.S. 133, 150-151 (2000). Instead, it must view all reasonable and justifiable inferences in the light most favorable to FTSI. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When the record is considered in this way, "even when the basic facts are undisputed, if reasonable minds could reach different conclusions regarding the inferences to be drawn from such facts, summary judgment is improper." *Jacquez v. Compass Bank*, No. EP-15-CV-26, 2016 U.S. Dist. LEXIS 67680, at, *16 (W.D. Tex. May 24, 2016).

**B.    The Court previously held that a fact question exists regarding whether the "highly compensated employee" exemption applied to Galvan.**

The "highly compensated employee" exemption applies to employees (1) who have a "total annual compensation of at least $100,000.00" (which must include at least $455.00 per week paid on a salary or fee basis), and (2) who regularly and customarily perform at least one of the duties of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(a), (b)(1); *see also Bollschweiler v. El Paso Elec. Co.*, 166 F. Supp. 3d 808, 815 (W.D. Tex. 2016) (*citing Zannikos v. Oil Inspections (USA), Inc.*, 605 F. App'x 349, 359 (5th Cir. Mar. 27, 2015)); *Guyton v. Legacy Pressure Control*, No. 5:15-cv-1075-RCL, 2017 U.S. Dist. LEXIS 7836, at *4 (W.D. Tex. 2017); *Benavides v. City of Austin*, No. A-11-CV-438-LY, 2012 U.S. Dist. LEXIS 193240, at *45 (W.D. Tex. 2012). "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c).

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**                                                                   **PAGE 6**

1.  **A fact question exists regarding whether Galvan's work was primarily non-manual or office work.**

Galvan contends in the Motion that FTSI "cannot prove that Mr. Galvan's primary duty included office or non-manual work." [Motion at pp. 16-17.] The Court has already determined that a genuine issue of material fact exists on this question. In its Order denying FTSI's prior motion for summary judgment, the Court acknowledged that an "employee's primary duty will usually be what he does that is of principal value to the employer," and that while time alone is not the sole test, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." [Order at p. 6 (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990); *Allen v. Coil Tubing Servs., LLC*, 846 F. Supp. 2d 678, 707 (S.D. Tex. 2012)).] The Court held that based on the parties' competing evidence and the fact that the service supervisor position is *not* among those "carved out" in the regulations as being presumptively manual, "the determination of whether [Galvan] is a manual laborer ineligible for the highly-compensated employee exemption is a fact-intensive analysis." [Order at p. 7.] The Court therefore declined to apply the exemption "as a matter of law in the face of disputed evidence." [*Id.*]

The facts of the case have not changed in the weeks since the Court issued its order, but Galvan now argues that "there is no credible evidence that Mr. Galvan performed non-manual work at all." [Motion at p. 17.] Of course there is. As set forth above, FTSI has introduced evidence that Galvan's primary duties as a Service Supervisor included (1) providing on-site supervision for all well completion jobs; (2) acting as FTSI's representative in dealings with customers on site; (3) overseeing all crew activities from home base to servicing at the job locations to returning to home base; and (4) treating the well from the data van. Galvan testified

that he spent a significant amount of time in the data van – FTSI's mobile office – performing the well-treatment functions on which he had received specialized training. He was the highest-ranking operations employee on the job site and admits that he was "the one running the show." Viewed in a light most favorable to FTSI, there is no doubt that this evidence at least raises a fact question regarding whether Galvan's primary duties were manual or non-manual in nature.

### 2. A fact question exists regarding whether Galvan regularly performed *at least one* of the duties of an executive or administrative employee.

Galvan further argues that FTSI "cannot prove that Mr. Galvan's duties met even one prong of either the executive exemption or the administrative exemption." [Motion at p. 17.] In framing the argument this way, Galvan purports to impose on FTSI a burden it does not have to shoulder at this stage. FTSI need not "prove" that Galvan regularly and customarily performed at least one of the duties of an executive or administrative employee. Instead, it need only produce enough evidence to demonstrate that a genuine issue of material fact exists to be determined by the jury.

#### a. Executive duties.

The "primary duty" of an executive employee is "management." Management "includes, but is not limited to, activities such as . . . training of employees; . . . directing the work of employees; maintaining production or sales records for use in supervision or control;. . . planning the work; . . . and providing for the safety and security of the employees or the property[.]" 29 C.F.R. § 541.102. The employee need not manage the entire enterprise, but rather only "a customarily recognized department or subdivision thereof." *Id.* § 541.100(a). Any unit of business that has a "permanent status and function" is a recognized unit or subdivision of a business. *Id.* § 541.103(a). A "recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the 'unit' has a continuing

function." *Allen v. Coil Tubing Servs., LLC*, 846 F. Supp. 2d 678, 708 (S.D. Tex. 2012), *aff'd*, 755 F.3d 279 (5th Cir. 2014).

Viewed in the light most favorable to FTSI, the evidence in the record reveals a genuine issue of material fact exists regarding whether Galvan regularly and customarily performed one or more of the "management" duties of an executive employee. As discussed above, FTSI organizes well-completion employees into independent "crews," each usually comprised of a Service Supervisor and between 15 and 20 subordinate employees, mostly including Equipment Operators. App. 19 (Galvan Dep 72:18 – 73:4). As a Service Supervisor, Galvan was the one "running the show." App. 12 (Galvan Dep. at 42:18-25). As the most senior operations employee on each job, he was the lead on the crew and made sure the jobs ran smoothly and the equipment operators were doing their jobs. App. 13-14, 22 (Galvan Dep. at 46:18-22; 53:19-23; 83:2-4). In fact, he was the only employee on the crew trained to actually treat the well from the data van. App. 16 (Galvan Dep. at 59:4-14). Galvan ran jobs and crews with little to no supervision. App. 14 (Galvan Dep. at 52:1-21) (Galvan's supervisor was on the job site less than 50% of the time and even when Galvan's supervisor visited the jobsite, Galvan performed the same supervisory duties he performed in his supervisor's absence).

Importantly, Galvan also had day-to-day supervisory control on his crew, as he:

- Made the day-to-day decisions on jobs (App. 12 (Galvan Dep. at 42:18-25));
- Ensured the safety of crew and company equipment (App. 23, 22 (Galvan Dep. at 88:17-89:3 and 83:5-18));
- Communicated with the on-site customer representative (App. 20 (Galvan Dep. at 74:14-23));
- Communicated with management regarding his crews daily performance (App. 25 (Galvan Dep. at 94:22-96:1)); and
- Reported hours to Field Coordinator for all employees on his crew (App. 26 (Galvan Dep. at 99:15-19)).

In determining FTSI's prior motion for summary judgment, the Court did not reach the question of whether Galvan regularly performed one or more of the management duties of an

executive employee. When presented with similar facts in similar cases, courts have had little difficulty in determining that the employees in question qualified for the executive exemption. For example, *Allen v. Coil Tubing Servs., LLC* involved overtime claims brought by a service supervisor who led CTS's well-service projects on client sites and supervised a group of service technicians. In that case, the court explained that:

> [a service supervisor's] managerial responsibilities while in the field performing CTS's projects for customers were extensive and of primary importance to CTS. For instance, as [a service supervisor], he was the senior CTS employee on all projects to which he was assigned in the field, whether on land or offshore, and [he] planned, assigned, and managed the work of the [service technicians] at the project sites to which he was assigned.

*Allen*, 846 F. Supp. 2d at 707. As a result, the court concluded that plaintiff's primary duties were managerial. *Id*. FTSI has presented enough evidence to raise a genuine issue of material fact regarding whether Galvan regularly and customarily performed at least one of the managerial duties of an executive employee.

### b. **Administrative duties.**

Alternatively and in addition, a genuine issue of material fact exists regarding whether Galvan regularly and customarily performed at least one of the duties of an administrative employee. The factual and legal basis for reaching this conclusion is set forth in Section III.C, below, but briefly stated, Galvan's primary administrative duty was running and supervising FTSI's well-treatment operation using the computer system installed in FTSI's "data van" mobile office. He was the only person on site with the training to do so. In addition, FTSI has introduced evidence that Galvan performed the non-manual administrative function of directing the work of the Silver crew, insofar as he was "running the show" on the various job sites worked by the crew he led. The Court must deny the portion of the Motion addressing the "highly compensated employee" exemption for this reason as well.

### 3. A fact question exists regarding whether Galvan met the compensation threshold.

It is undisputed that in the years Galvan worked as a Service Supervisor I and II, he made more than $100,000 on an annual basis.[2] App. 17 (Galvan Dep. at 64:20-23). In 2014, Galvan exceeded that threshold in 10 months, earning $108,620.52 from March to December. *Id.*; App. 54 (Dep. Exh. 12). In 2015, Galvan earned $130,445.26. *Id.*; App. 55 (Dep. Exh. 13). As Galvan notes in the Motion, a portion of his six-figure income was attributable to bonuses, rather than to his base salary of almost $85,000. [Motion at p. 15.] The $100,000 statutory threshold expressly *includes* "commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during" the year. 29 C.F.R. § 541.601(b)(1). Thus, Galvan is correct in concluding that FTSI "is relying on bonus income to characterize Mr. Galvan as a highly compensated employee." [Motion at pp. 15-16.] In the Motion, Galvan argues that the bonuses he received for completing "stages" of drilling operations were discretionary, apparently because an offer letter FTSI sent him "says nothing about bonuses, and Mr. Galvan did not receive a written bonus plan." [Motion at p. 16.]

Galvan offers no affirmative evidence in rebuttal to his own admission that he earned well over $100,000 annually. Galvan is thus calling on the Court to weigh the undisputed evidence that Galvan earned well over $100,000 annually, and to make inferences and reach conclusions about that evidence *in favor of himself, as the movant*, in order to grant summary judgment. Of course, the Court must do just the opposite. At a bare minimum, there is a genuine issue of material fact regarding whether Galvan's bonus income "counts" for purposes of applying the "highly compensated employee" exemption.

---

[2] The $100,000 requirement is satisfied for a year in which the employee works less than the full year if he is paid a *pro rata* portion of the $100,000 based on the period of time he worked. *See* 29 C.F.R. § 541.601(b)(3).

C. **There is a fact question regarding whether the administrative exemption applied to Galvan.**

Alternatively and in addition, the Court should deny the Motion because FTSI has presented sufficient evidence to raise a genuine issue of material fact regarding whether the administrative exemption applied to Galvan. The FLSA's overtime rules do not apply to "employees employed in a bona fide administrative capacity." 29 U.S.C. § 213(a)(1). That term means any employee:

(1)     compensated on a salary or fee basis of at least $455 per week;

(2)     "whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and

(3)     "whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

29 C.F.R. 541.200(a)(1)-(3). Galvan does not dispute that his compensation easily cleared the minimum weekly salary threshold; instead, he argues that FTSI "cannot produce evidence that would satisfy the second or third prong of the administrative exemption test." [Motion p. 11.] To the contrary, FTSI has presented credible evidence to satisfy both disputed prongs.

1.      **Galvan's *primary* duty was the performance of the non-manual work of administering the "treating" operation on the job site from FTSI's mobile office.**

As set forth above, the Court has already determined – albeit in the context of applying the "highly compensated employee" exemption – that a genuine issue of material fact exists regarding whether Galvan's work was primarily manual or non-manual in nature. That is, material fact questions exist regarding whether Galvan's primary duty was the "performance of office or non-manual work directly related to the management or general business operations" of FTSI. Galvan contends that the work he did was "physical," and therefore was not "office or non-manual work." [Motion pp. 11-12.] In support of this contention, Galvan points exclusively

to his deposition testimony and a self-serving declaration he offered in response to FTSI's earlier motion for summary judgment, in which he testified that he was the person on the job site responsible for "treating" during the operational stage of FTSI's work on a job site. [Motion p. 12; Galvan Dec. (doc. 11-1) ¶¶ 9.] He admits that he performed this work inside FTSI's "data van," a heated and air-conditioned mobile office in which he operated computers controlling the pumps used to drive fluids used in the fracking process. [Galvan Decl. ¶¶ 9-12.] His attempts to characterize this work as "manual" are not credible:

- "The work Mr. Galvan performed in the data van was manual – driving sand and fluids into wells by *sending signals to the pump with a computer mouse*." [Motion p. 12.]

- "In performing my treating work for [FTSI], I was required to use repetitive hand motions to control the pumps. *Specifically, I used a mouse to select images on a computer screen* that represented the pumps and gears that I was working with, and I operated the pump and gears by *using the mouse to click on images* to change the settings and other variables." [Galvan Decl. ¶ 10.]

He also complains that the heating and air conditioning system "did not work well" and the office was "dirty" and "very loud." [Galvan Decl. ¶ 12; *see* Motion at p. 12.] Galvan has directed the Court to no authority for the proposition that working in a dirty office with a malfunctioning air conditioner is akin to not working in an office at all. Galvan acknowledges that the "treating" work he performed using the computer was his primary responsibility during the operational stage of FTSI's work on the job, and that as the only Service Supervisor on site, it was his responsibility *alone*. [Galvan Decl. ¶ 9.] This testimony alone is enough to create a genuine issue of material fact regarding whether his "primary duty" involved "office or non-manual work."

Galvan further argues that his non-manual or office work in FTSI's data was not "directly related to the management or general business operations of the employer or the

employer's customers." [Motion at p. 11 (citing 29 C.F.R. § 541.200).] This phrase in the FLSA has been further defined to mean work performed by the employee that was "directly related to *assisting with* the running or servicing" of an employer's business operations. 29 C.F.R. § 541.201(a) (emphasis added). Galvan argues for the application of a "functional areas" test, relying on a regulation providing a *non-exclusive* list of functional areas that are generally considered to be "directly related to assisting with the running or servicing of the business." [Motion at p. 12 (citing 29 C.F.R. § 541.201(a).] However, the same logic the Court relied on in finding that fact questions precluded summary judgment in favor of FTSI on its earlier motion (regulatory silence), when combined with the evidence discussed above regarding Galvan's office work directing the well-treatment services that form the core of FTSI's business operations, presents a "fact-intensive analysis" not appropriately resolved as a matter of law on summary judgment.

### 2. Galvan's primary duty included the exercise of discretion and judgment with respect to matters of significance.

Finally, the same evidence demonstrates the existence of a disputed question of fact for trial regarding whether Galvan's primary duties included the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(3). In directing the work of the Silver crew, and in controlling the well-treatment services on the job site, Galvan certainly worked on matters of significance, which refers only to "the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The relevant regulations give examples of sufficiently "consequential" administrative duties, including whether the employee "has the authority to . . . implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of

the business," and "whether the employee performs work that affects the business operations to a substantial degree[.]" 29 C.F.R. § 541.202(b).

Galvan testified that he was the only person on his crew with the training to implement and carry out FTSI's policies and procedures regarding treatment of the well. Galvan argues that the absence of "policies and procedures authored by him" and "contracts or purchase orders bearing his signature" demonstrates as a matter of law that he was not acting in an administrative capacity. [Motion at p. 14.] Yet, "final decision making authority over matters of consequence is unnecessary." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000) (affirming summary judgment for employer on administrative exemption). "Employees may exercise discretion and independent judgment even if they consult manuals or guidelines," as Galvan did in administering FTSI's well-treatment operations at the job sites he ran. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006). The Court need not make a final determination regarding whether Galvan acted as an administrative employee for FTSI. Its only task at this stage is to determine whether the evidence adduced by FTSI, viewed in a light most favorable to it, demonstrates the existence of a genuine issue of material fact for trial regrading whether Galvan's primary job duties included the exercise of discretion regarding matters of significance. Based on all of the foregoing, the answer is plainly yes – at a bare minimum, there is a fact question for trial.

## IV.
## CONCLUSION

For the foregoing reasons, FTSI respectfully requests that the Court deny the Motion, and grant all other relief, general or special, at law or in equity, to which FTSI may be justly entitled.

Respectfully submitted,

/s/ *John M. Barcus*
John B. Brown
Texas Bar No. 00793412
john.brown@ogletreedeakins.com
John M. Barcus
Texas Bar No. 24036185
john.barcus@ogletreedeakins.com
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas  75225
Telephone: 214-987-3800
Facsimile:  214-987-3926

AND

Ryan M. Miller
Texas Bar No. 24070281
ryan.miller2@ftsi.com
**FTS INTERNATIONAL SERVICES, LLC**
777 Main Street, Suite 3000
Fort Worth, TX 76102
Telephone: 817-339-3696

**ATTORNEYS FOR DEFENDANT
FTS INTERNATIONAL SERVICES, LLC**

## CERTIFICATE OF SERVICE

This is to certify that on May 8, 2017, I electronically transmitted the foregoing document to the Clerk of Court using the ECF system of filing, which will transmit a Notice of Electronic Filing to all attorneys deemed to receive service.

/s/ *John M. Barcus*
John M. Barcus

29747724.1